UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                          :

      - v. -                                               :             23 Cr. 032 (LTS)

RUSSELL DWAYNE LEWIS,                             :
      a/k/a "Clifford Ari Getz,"
      a/k/a "Clifford Ari Getz Cohen,"       :
      a/k/a "Ari Getz,"
      a/k/a "Aryeh Getz,"                          :

                        Defendant.            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## THE GOVERNMENT'S SENTENCING MEMORANDUM


                                          DAMIAN WILLIAMS
                                          United States Attorney for the
                                          Southern District of New York
                                          Attorney for the United States of America


Alex Rossmiller
Assistant United States Attorney
      - Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                      :

       - v. -                                :            23 Cr. 032 (LTS)

RUSSELL DWAYNE LEWIS,                          :
    a/k/a "Clifford Ari Getz,"
    a/k/a "Clifford Ari Getz Cohen,"          :
    a/k/a "Ari Getz,"
    a/k/a "Aryeh Getz,"                       :

              Defendant.                :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**SENTENCING MEMORANDUM**

The Government respectfully submits the following memorandum in connection with the sentencing of Russell Dwayne Lewis, a/k/a "Clifford Ari Getz," a/k/a "Clifford Ari Getz Cohen," a/k/a "Ari Getz," a/k/a "Aryeh Getz" (the "Defendant"), which is scheduled for October 12, 2023, and in response to the defendant's sentencing memorandum dated September 27, 2023 ("Def. Mem."). Under the United States Sentencing Guidelines (the "Guidelines"), and as set forth in the plea agreement dated June 1, 2023 (the "Plea Agreement"), the applicable sentencing range is 63 to 78 months of imprisonment, to be followed by a mandatory consecutive term of 24 months of imprisonment, for a total range of 87 to 102 months of imprisonment.

For the reasons set forth below, the Government submits that a sentence of 102 months of imprisonment—that is, at the top of the stipulated guidelines range of 87 to 102 months—would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing set forth in Title 18, United States Code, Section 3553(a), and that such a term of incarceration is the minimum necessary to serve those purposes of sentencing.

## Background

### A.   The Offense Conduct

1.   Overview

The defendant's conduct in this case was calculated, sophisticated, and predatory.  It was not a momentary lapse of judgment, or a single criminal act, or a scheme perpetrated against just one individual.  Rather, the defendant engaged in a wide variety of fraud, against several individual and entity victims, over the course of years and to the tune of millions of dollars of victim losses— and utilizing stolen identifying information of at least two other individuals to do so.  The defendant's conduct was also deeply callous.  He engaged in fraud on both systematic and opportunistic bases, and he lied prolifically and continually to victims and others.  He targeted vulnerable individuals, and with respect to the two statutory victims, he did not stop until he had taken essentially all of their money.  (*See* Probation Office's Pre-Sentence Investigation Report ("PSR") ¶¶ 12-14.)

As Victim-1 describes in his statement to the Court, the defendant's "carefully designed" manipulations "wip[ed] out his entire life savings, including all [his] pension and economic safety nets," leading to personal bankruptcy and eviction from his home as well as the destruction of his personal life and relationship with his family.  *See* Exhibit A (Impact Statement of Victim-1) at 1-2. Similarly, Victim-2 describes the defendant as a "wolf in sheep's clothing" who stole from her and then threatened and belittled her as she desperately tried to get back the "investment" the defendant pressured her to give him.  *See* Exhibit B (Impact Statement of Victim-2) at 2-3.

As further described below, the defendant also victimized and attempted to victimize numerous others, as opportunities arose, including individuals he "hired" with no intent or ability to pay, a religious institution, and employees and representatives of a major company he falsely claimed to intend to purchase.  All the while, he told increasingly fantastical and outrageous lies

to enrich himself at the expense of others—until he was finally apprehended.  There is little doubt that the defendant would have continued his conduct had he not been arrested and, without a sufficient deterrent message, is likely to return to fraud and predation.

    2.  <u>Fraud Against Victim-1</u>

Over the course of approximately four years, the defendant befriended Victim-1, became his close friend and confidant, hired him purportedly to help operate and manage a family office worth billions of dollars, and defrauded him out of more than $3 million.  (PSR ¶ 15.)

    a.  *The Personal Relationship Between the Defendant and Victim-1*

Until Victim-1 met the defendant, Victim-1 was a successful businessman living in California and working for his family's successful business.  In 2016, Victim-1 met the defendant, who introduced himself as Clifford Ari Getz Cohen.  The defendant and Victim-1 first came to know each other through exercising at the same gym, and they quickly became friends.  The defendant was extremely charismatic, and Victim-1 confided in him about challenges in his personal life and his professional career.  In turn, shortly after they met, the defendant told Victim-1 that he was worth approximately $30 billion, from real estate investments and standby letters of credit, but that he was highly secretive and kept a low profile.  (PSR ¶¶ 16-17.)

The defendant claimed to Victim-1 that his (the defendant's) wealth was all in trusts, and that he did not own anything directly, but that he directed much of his wealth to charitable causes and invested the remainder in ways that returned profits multiple times over.  The defendant also claimed or implied that his assets were overseas, and occasionally said there were issues with getting money into his domestic accounts.  The defendant claimed to Victim-1 that he had worked for the Central Intelligence Agency, that he had been born in London, and that he was a rabbi, all of which was false.  When Victim-1 attempted to find out information about the defendant online,

the defendant told him that the lack of publicly-available information about him was intentional. (PSR ¶¶ 18-21.)

As part of their increasingly close friendship, and believing the defendant was a successful businessman, Victim-1 solicited professional and investment advice from the defendant.   In approximately July 2016, the defendant told Victim-1, in sum and substance, that a partner of the defendant was working on a particular app for businesses.   In response to the defendant's solicitation of an investment in that app, Victim-1 gave the defendant a significant amount of money for the first time, providing $25,000 for additional development of the purported app and other potential projects.   During approximately the second half of 2016, the defendant and Victim-1 began to discuss a possible further business relationship.   In particular, they discussed Victim-1's coming to work for the defendant and sourcing business opportunities in which the defendant could invest some of his supposedly vast wealth.   In approximately early 2017, Victim-1 left his job and began working for the defendant, including more formally in late 2017 at an office the defendant appeared to rent.   (PSR ¶¶ 22-25.)

During 2017, the defendant continued to ask Victim-1 for "loans" or investments, and Victim-1 complied. Over time, the relationship between the defendant and Victim-1 became closer, to the level of family (as Victim-1 perceived it), and eventually Victim-1 trusted the defendant completely.   Victim-1 viewed the defendant as a mentor and spiritual guide and started regularly joining the defendant for religious services and meals, as well as leaning heavily upon the defendant for support and advice in Victim-1's personal life.   At the same time, Victim-1 was working extensively to explore opportunities in business and finance, to be able to assist the defendant in identifying productive investment opportunities.   The defendant also continued to ask Victim-1 for money, which was characterized as investments and/or loans, and which Victim-1 routinely provided.   Victim-1 believed the defendant always had a business reason for asking for

money, and Victim-1's belief that the money was being utilized for investment projects was at times bolstered by the very specific amounts the defendant requested.  Victim-1 repeatedly asked about being repaid, and the defendant consistently promised that Victim-1 would be reimbursed eventually.  (PSR ¶¶ 26-27.)

> b. *Victim-1's "Employment" for the Defendant*

Victim-1 was "employed" by the defendant between approximately 2017 and 2020. Victim-1's role was to find investment opportunities for the defendant, particularly in the fashion and retail spaces, in which the defendant appeared interested.  During much of that time, the defendant maintained office space in Beverly Hills, California, including two rented suites in the same office building.  (PSR ¶¶ 27-28.)

The defendant also employed, or appeared to employ, other individuals at the offices.  In fact, in order to maintain the appearance of being a successful businessman while gradually convincing Victim-1 to transfer his money to the defendant, the defendant convinced several individuals to come work for him while having neither the ability or the intent to actually to pay their salaries.  One of the individuals moved across the country from Miami, Florida, to Los Angeles, California, for employment with the defendant.  That individual was promised an annual salary of $425,000, and incurred $10,000 in relocation costs; he was never paid anything by the defendant and resigned after two months.  Several other employees also were "hired" by the defendant and have since sued him for complete nonpayment in connection with their purported employment contracts.

Additionally, the defendant, with the assistance of Victim-1, hired an individual in March 2020 ("Individual-1").  Individual-1 had a background in business administration, including auditing and work in finance and operations for startup companies.  Individual-1 initially was hired as Chief Accounting Officer for the defendant, who described the job responsibilities as including

helping with due diligence, tracking financial investments, and researching and evaluating investment opportunities.  In particular, the defendant told Individual-1 that he was looking for high-growth opportunistic investments.  The defendant conveyed to Individual-1 that his company was funded entirely by his and his family's money, and that there was plenty of liquidity to make investments and purchases.  Shortly after Individual-1 was hired, she was promoted to Chief Financial Officer.  The defendant falsely represented to Individual-1 that he was worth more than $10 billion, and promised her an annual salary of hundreds of thousands of dollars.  Individual-1 was never actually paid anything.  (PSR ¶¶ 29-32.)

Victim-1 and Individual-1 both worked on evaluating possible investments and acquisitions for the defendant; neither one had visibility into any accounts in the name of "Getz" or any of his purported companies.  However, they believed he had the money to make the investments they researched, some of which the defendant suggested and some of which they proposed.  Victim-1 undertook due diligence on several possible deals between 2018 and 2020; although none of the deals came to fruition, the defendant always had a reason or explanation. When a payment date would approach for a deal, the defendant would say that his money was tied up abroad, and that he was unable to access his wealth.  He also blamed the COVID pandemic, which he said made international banking difficult.  (PSR ¶¶ 33-34.)

As further described below, both Victim-1 and Individual-1 were involved with the negotiations regarding a particular entity the defendant eventually purported to attempt to purchase for hundreds of millions of dollars ("Corporation-1").  In particular, Victim-1 saw an article online about the bankruptcy proceedings of Corporation-1 and brought it to the attention of the defendant, who said he was interested in purchasing Corporation-1.  Victim-1 and Individual-1 contacted representatives of Corporation-1 to convey the defendant's offer to purchase the company for approximately $290 million.  In the following weeks, Victim-1 and Individual-1 both spent

significant time and effort to pursue the bid and to undertake due diligence; they also interacted extensively with representatives from Corporation-1.  Nevertheless, as described below, the defendant did not—and could not possibly have—complete the offer.  (PSR ¶¶ 35-36.)

Individual-1 continued working for the defendant through approximately late 2020 or early 2021; she was never paid any of her promised salary and eventually stopped working for the defendant, and ceased contact with him, in early 2021.  Similarly, Victim-1 was never paid any meaningful amount of money and no longer had contact with the defendant after approximately spring 2021.  (PSR ¶¶ 37-38.)

In total, by 2020, Victim-1 had transferred more than $3 million of loan and/or investment funds to the defendant in less than three years and on approximately more than 25 occasions.  That total was essentially all of Victim-1's liquid assets, including money from his retirement savings and proceeds from the sale of his house.  Even as Victim-1 lost all liquidity, including taking cash advances on his credit cards and considering bankruptcy, he continued paying for certain of the defendant's expenses through at least in or about June 2021, including business expenses.  Following that period, Victim-1 was evicted from his apartment and ultimately filed for personal bankruptcy.  (PSR ¶¶ 38-39.)

### 3.  Fraud Against Corporation-1

In August and September 2020, the defendant fraudulently offered to acquire Corporation-1 and its assets for $290 million in case.  That fake offer resulted in weeks of due diligence processes, legal discussions, and negotiations, including through which the defendant, Victim-1, and Individual-1 had access to certain of Corporation-1's internal business records and materials.  Corporation-1 and its representatives dedicated significant time and resources to the purported offer, based on the false premise that the defendant intended to, and could, purchase it for hundreds of millions of dollars.  (PSR ¶ 40.)

In particular, in early August 2020, Corporation-1 initiated bankruptcy proceedings and solicited bids for its business, including with the assistance of counsel.  On August 4, 2020, Victim-1 emailed counsel to Corporation-1, stating that he was the President of "Neviim Equity," a "family office trust looking to invest in distressed organizations."  The email expressed possible interest in purchasing the assets of Corporation-1 and copied "C. Ari Getz."  Days later, the defendant made a purported all-cash offer to purchase Corportion-1 and a related entity for $290 million.  In subsequent communications with Corporation-1 and its representatives, the defendant claimed, among other things, to be worth more than $18 billion dollars.  (PSR ¶¶ 41-43.)

As part of the discussions, a representative of Corporation-1 requested, among other documentation, a bank statement from the defendant showing sufficient funds to complete the acquisition.  Shortly thereafter, the defendant provided, through Individual-1, a letter appearing to be from a multinational bank headquartered abroad (the "Bank Letter").  The Fraudulent Bank Letter, which appeared to be signed by two bank employees, purported to confirm the existence of an account at the bank for the benefit of "Rabbi Clifford Getz" holding cash in the amount of €300 million.  The Bank Letter stated that the bank was "ready, willing and able to issue cash-backed Standby Letter of Credit in the amount [of €300 million] for the benefit or Rabbi Clifford Getz, Trustee to the designated beneficiary account immediately upon your instruction."  The Bank Letter was entirely fraudulent.  (PSR ¶¶ 44-46.)

In the following weeks, the defendant continued to proceed as if the purchase offer was legitimate but repeatedly refused to provide any additional proof of funds information.  In one call between the defendant and Corporation-1 representatives, which was recorded, the defendant claimed, among other things, that Neviim "buy[s] hundreds of millions of dollars from pharmaceuticals" and that he engaged in "very humanitarian projects around the globe."  The defendant also stated that his funds were being routed through, and had been delayed by, "banks

all around the globe."  The defendant further claimed to be 68 years old, to have grown up in London, and to have a PhD in theoretical mathematics and statistics, a master's degree in neurophysics, a master's degree in genetics, and a master's degree in quantum physics.  Each of those claims was false.  (PSR ¶¶ 47-49.)

Shortly thereafter, the defendant stopped communicating with representatives of Corporation-1, including through his associates, and the deal was never completed.  (PSR ¶ 50.)

4.  <u>Fraud Against Victim-2</u>

In addition to his supposed business activities, the defendant also charged some individuals for purported astrological readings and analyses.  One such individual was a widow with four children.  Victim-2 was introduced to the defendant and paid him for those services over the course of several months.  The defendant told Victim-2 that he was a billionaire, and that it was in her chart to get her mortgage paid off and to obtain financial freedom.  The defendant also claimed, among other things, that he had previously been in the U.S. military and had worked for the Secret Service for most of his career, that he worked for and had friends in the Los Angeles Police Department and Beverly Hills Police Department, that he performed astrological readings for police officers and for a particular tech company billionaire, and that he assisted in picking the jury for the OJ Simpson trial based on his astrological readings and charts.  Each of these claims was false.  (PSR ¶¶ 51-54.)

In March 2020, the defendant offered Victim-2 a "guaranteed" investment opportunity in connection with a purported real estate development.  Specifically, he said the deal involved a real estate project that was in progress but unfinished, and he said the investment opportunity would help Victim-2 escape her financial troubles.  The defendant told her that in exchange for an investment of $300,000, she would get back $575,000, and he provided her with a post-dated check for that amount as a "guarantee."  Victim-2 initially declined, explaining that she could not afford

the investment.  The defendant said she would be paid back within two weeks—and that he already had committed to the investment so she could not back out.  The defendant ultimately convinced Victim-2 to agree, and she wired him $300,000.  In return, the defendant provided Victim-2 with a check for $575,000, post-dated for several weeks later, and told Victim-2 she could deposit it then.  When Victim-2 expressed concern, the defendant laughed and said, in substance, that he was a billionaire and would not risk going to jail over writing a bad check.  (PSR ¶¶ 55-59.)  In fact, the defendant never had the ability to, and never intended to, pay back the "investment" by Victim-2.  (*See* PSR ¶¶ 60-61.)

Shortly thereafter, the defendant told Victim-2 that the real estate investment was short by an additional $255,000, and that if Victim-2 provided that amount, he could get her back an additional $1 million.  When Victim-2 hesitated, the defendant told her that he had organized the investment for her and put his neck out for her, and that she was being ungrateful.  Victim-2 relented and agreed, wiring an additional $225,000 to the defendant.  The defendant gave Victim-2 another post-dated check, for $1 million, dated April 28, 2020.  On April 28, 2020, the defendant's bank account held less than $1,000.  When that date arrived, the defendant told Victim-2 not to deposit the checks, and began to make excuses for why he did not have the money.  Over the following weeks and then months, the defendant told Victim-2 not to cash the checks for a variety of reasons, and claimed that the money was delayed, or held up, or in the process of being withdrawn, in addition to other excuses.  (PSR ¶¶ 62-68.)

In approximately September 2020, the defendant told Victim-2 that she could deposit the first postdated check, for $575,000.  When Victim-2 attempted to do so, the check bounced due to insufficient funds.  At the time, the account from which the check was written contained less than $1,000.  The defendant then told Victim-2 that if she went to the police of the check bouncing, the defendant would get a slap on the wrist and then would declare bankruptcy so Victim-2 would

never recover her money.  Over time, the defendant stopped responding to Victim-2's attempts to communicate with him for the return of her funds.  (PSR ¶¶ 69-71.)

      5.   False Identifying Information and Identity Theft

During the course of his schemes, the defendant identified himself in communications, or was referred to by others, as "Ford Getz," "Ari Getz," "Clifford Ari Getz," and "Aryeh Getz," among other names.  The defendant also has used the name and date of birth of an individual who has been identified by law enforcement officers (the "Fraudulent Identity").  The defendant also utilized the social security number of an approximately 13-year-old child residing in Ohio (the "Fraudulent SSN").  The defendant also used the Fraudulent Identity and the Fraudulent SSN in credit card applications and documents submitted to financial institutions.  The defendant also utilized the Fraudulent Identity and Fraudulent SSN to obtain a passport issued by the United States based on the stolen identifying information.  (PSR ¶¶ 72-75.)

**B.    The Defendant's Plea, Guidelines Range, and Restitution and Forfeiture**

On August 16, 2022, the defendant was charged by complaint with three counts of wire fraud and one count of aggravated identity theft.  On January 23, 2023, the defendant was charged with the same counts in an Information.  On June 13, 2023, the defendant pled guilty, pursuant to a plea agreement, to two counts of wire fraud and one count of aggravated identity theft.  (PSR ¶¶ 1-7.)

As agreed by the parties, and as calculated by the Probation Office, the defendant's stipulated Guidelines Range is 63 to 78 months of imprisonment, to be followed by a mandatory consecutive term of 24 months of imprisonment, for a total range of 87 to 102 months of imprisonment (the "Guidelines Range").  (PSR ¶¶ 8, 153.)

The Probation Office recommends the defendant be sentenced to a total sentence of 94 months of imprisonment, including a sentence of 70 months on each wire fraud count, to run

concurrently, followed by a 24-month consecutive term of imprisonment on the aggravated identity count.  (PSR at 37.)

As set forth in the Plea Agreement, and in accordance with 18 U.S.C. §§ 3663 and 3664, the Government seeks restitution in the amount of $3,788,143.58.  Enclosed with the Government's sentencing letter as Exhibit C is a proposed Order of Restitution, a copy of which has been provided to the Court with an attached schedule of victims and corresponding loss amounts.  (PSR ¶¶ 78-80.)

Also as set forth in the Plea Agreement, and pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), the Government seeks forfeiture in the amount of $3,788,143.58.  This Court previously entered a preliminary Consent Order of Forfeiture, *see* Dkt. 36, consistent with this request and with the consent of the defendant.  (PSR ¶¶ 8, 167-68.)

The maximum fine of twice the pecuniary gain is $7,576,287.16, and the Guidelines fine range is from $25,000 to $250,000.  (PSR ¶¶ 160, 162.)

<u>**Discussion**</u>

**A.    The Defendant's Conduct Warrants a Term of Imprisonment at the Top of the Stipulated Guidelines Range**

For the reasons set forth below, consideration of the relevant factors under 18 U.S.C. § 3553(a) weighs heavily in favor of a sentence at the top of the Guidelines Range—that is, a lengthy term of incarceration.  In particular, the nature and seriousness of the offense and the need to promote respect for the law and afford adequate deterrence, including specific deterrence, are the most significant factors here.

1.   <u>The Nature and Seriousness of the Offense</u>

The breadth and duration of the defendant's wrongdoing, and its profound effect on his victims, warrant a sentence at the top of the Guidelines Range.  The defendant's crimes were

extremely serious and profoundly harmful to his victims. The scope of the defendant's lies, the level of sophistication and brazenness involved in the schemes, and the targeting of vulnerable individuals—and exploiting them for everything they had—all make clear that the defendant committed extremely serious offenses.

The defendant profited from exploiting the trust of those around him, which he was willing and able to take advantage of. In particular, Victim-1 and Victim-2 were both experiencing personal challenges when the defendant claimed to be able to help them, both with respect to their lives and their financial circumstances. As Victim-1 describes, the defendant preyed on his "fervent desire for a change" in his life, isolating Victim-1 from his wife, family, friends, and associates of over 40 years. *See* Impact Statement of Victim-1 at 1. The defendant infiltrated his life and then bled him dry over the course of years—after which the defendant continued to maintain the charade, to prevent Victim-1 from going to authorities, perpetrating "devastating emotional abuse." *Id.* at 2. As Victim-1 stated further about the defendant: "His was not a lack of judgment or simply actions initiated by greed. This was a calculated effort to control me and everyone else around him – with abusive, emotional pressure to support his own rich and flavorful lifestyle." *Id.* at 2.

Similarly, Victim-2 describes herself as a trusting person and also a bit naïve who was at a low point in her life when she met the defendant through a mutual friend. *See* Impact Statement of Victim-2 at 1. As Victim-2 explained: "He played the long game with me, learning all he could about me and my family. He learned about my finances, and that I was in peril of losing my home [. . .] Eventually, after many meetings, he told me he was the financial adviser to numerous billionaires and would allow me to invest in one of his real estate deals with his other investors. [. . .] He presented a vulnerable and distressed widow an opportunity to salvage her life." *Id.* at 1.

In order to continue appearing to be extravagantly wealthy to his marks, the defendant went to extraordinary lengths to create and maintain that false image.  Among other things, he created an entire purported investment company, "employing" individuals whom he lured with promises of financial stability and business success—and then never paid them.  (*See* PSR ¶ 15.)  One of those individuals moved across the country from Miami to Los Angeles for a job with the defendant, incurring thousands of dollars in relocation costs and untold amounts in lost wages and significant stress and upheaval in his life.  The defendant had promised him an annual salary of $425,000; after he moved across the country for this new job, the defendant never paid him a penny.  The defendant similarly hired Individual-1, who had extensive experience in business, and who was promised a large salary and significant responsibilities; as with all his other employees, he paid her nothing.  (*See* PSR ¶¶ 30-32, 37.)

In connection with his fake business, and to further perpetrate his schemes against victims from whom he was stealing money, the defendant pretended to be able to purchase Corporation-1 for hundreds of millions of dollars.  His "employees" spent tremendous time and effort to finalize a deal the defendant knew would not, and could not, ever happen, and representatives and employees of Corporation-1 similarly spent significant amounts of time and money on the potential deal.  (*See* PSR ¶¶ 40-50.)  In one call with employees and representatives of Corporation-1, the defendant stated the following:

> [L]et me share some things about me so you'll kind of get a better understanding of who I am.  Um, one, one I'm an orthodox rabbi.  I grew up in a, in a very Satmar community in Sanford Hills, London many years ago.  I have a PhD in theoretical mathematics and statistics, I have a Masters in neuro physics, I have a Masters in genetics, I have a Masters in quantum physics, and I teach a lot of people how to use the mind um, and in epi genetics I will tell you that there's, there's no standard in old thinking of, of medicine comes about the, you know, here's a printout of your genes, here's your lineage and this is how your body's gonna respond to everything, and in epi genetics we look at it and say everything is based off of your environment, and I'm, I'm writing extensively now about COVID because its affected all kinds of religions, all kinds of races, its affected obese people, skinny

people, all kinds of people and one common thread that we keep looking at is the environment of, of what people share and how you were raised, you know, where you come from alcoholic parents or the neighborhood you grew up or the news media, how this twenty-four hour news cycle, how you digest all this information and what causes one person to suffer from COVID and another person's exposed and they become asymptomatic and, and go on with their life. So, I look at things from a very different approach, I control what I can control. Uh, my daughter runs a foundation and we give away four year, full ride college uh, tuition for kids that come out of Jewish families who can't afford to go to college, and the only thing that we ask of them [. . . .] at the end of the day, once they graduate, the only thing that they owe us is they have to go somewhere around the globe and volunteer. We will put them on a salary, so they don't have to worry about income coming in. But I want this generation to understand what it is like to sacrifice their time for humanity. We produce too immature of an, a high school graduate today with no coping skills, and I'm trying to change that, person by person, because we'll never build a better society until we can build a better human being. I always say, the service I do for others is the rent I pay for my time on earth. I truly believe giving back and helping humanity, and look, I know how to make money, I don't know how to make time. I don't, and I want people to understand what it is like to give their time.

Not one of these statements by the defendant about himself is true. And his willingness to lie, to lie repeatedly, fantastically, confidently, and without any apparent hesitate, regret, or remorse, underscores the seriousness of his crimes.

His lying was also not limited to the victims in this case—as described above, the defendant also defrauded other "employees" that he "hired" and then never paid. Additionally, while the defendant's sentencing was pending, a rabbi in Los Angeles (the "Rabbi") contacted the Government in connection with this case. The Rabbi advised the government that the defendant—whom the Rabbi knew as Ari Getz—visited his synagogue for a period of time, and during that time the defendant represented himself as a billionaire and claimed to be willing to support the synagogue financially. In one instance, the synagogue was holding an annual auction, the proceeds of which were intended to cover annual operating costs. During the auction, the defendant asked, in sum and substance, what the entire annual budget was for the synagogue, and was informed that it was approximately $750,000. The defendant—presumably in an effort to build credibility with

a congregation that could supply new victims to the defendant—said he would cover that entire amount, essentially putting an end to the fundraiser.  Of course, the defendant never provided any of the money he had promised, and for months he provided excuses before finally disappearing entirely.

In sum, the defendant's fraudulent conduct was extensive, pernicious, calculated, and intentional.  The defendant appears to have been constantly looking for victims, representing himself as a wealthy investor in a wide variety of circumstances and contexts—and when he found victims, he took them for everything they were worth.

    2.   <u>The Need to Promote Respect for the Law and to Afford Adequate Deterrence</u>

The importance of promoting respect for the law and affording adequate deterrence further supports imposition of a sentence at the top of the Guidelines Range.  Given the magnitude and breadth of the conduct in this case, those interests of sentencing are best served by a very significant term of imprisonment.  The defendant's pattern of deception, and his attempts to minimize certain aspects of his conduct even now, should be met with punishment that holds him accountable for the full measure of his criminal conduct.

The sentence the defendant seeks—that is, a sentence below the stipulated Guidelines Range—would send precisely the wrong message for both general and specific deterrence.  Crimes of fraud are committed in secret and are often hidden from victims—as here, where it took months or years for victims to realize their money was being stolen—and are often difficult to identify and prosecute.  Here, detection was particularly difficult for two reasons.  First, the defendant convinced his victims for lengthy periods of time that he was, in fact, an entirely different person with essentially unlimited funds, and that the only way victims would ever recover their "investments" was to simply wait.  Second, with respect to Victim-2 in particular, when she realized she had been defrauded, the defendant threatened her to prevent her from going to

17

authorities and told her that if she did, she "better watch out."  *See* Impact Statement of Victim-2 at 2.  He also told her that if she went to the police, he would get a slap on the wrist and would pay virtually nothing in restitution.  The defendant undertook these tactics to avoid detection—which he did successfully, for years—carefully and consciously.

"Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence. Defendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment."  *United States v. Peppel*, 707 F.3d 627, 637 (6th Cir. 2013) (citing *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006)).  The defendant's scheme here, like many white collar offenses, involved a high reward and a low risk of detection.  To deter such conduct, the penalty for those caught must be sufficient to alter this risk analysis.  *See United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to the expected benefits of a crime and hence the punishment required to deter it.").

6.  <u>The Need for Specific Deterrence and to Protect the Public From Further Crimes</u>

Finally, a lengthy term of incarceration is appropriate because of the necessity for specific deterrence and to protect the public from further crimes committed by the defendant.  The defendant argues that the Court "should consider the low risk of recidivism presented by Mr. Lewis's history and characteristics."  Def. Mem. at 11.  That argument is not accurate.  This is the defendant's third felony conviction, following convictions for aggravated robbery with a deadly weapon and for fraud.  Although those convictions were some time ago, the defendant's history, which includes years spent perpetrating the crimes for which he is charged here, and his obvious willingness to keep committing crimes well into his 50s, strongly indicate that the defendant is an

exceptionally high risk for recidivism.  The defendant is willing to tell extraordinary lies, over lengthy periods, with no regard for others, in order to steal money.  Nothing about his employment history, his guilty plea here, or his other history and characteristics indicates otherwise.

The defense argues that the defendant should be given a below-guidelines sentence in part because of his acceptance of responsibility.  *See* Def. Mem. at 1.  But the defendant has not taken any more responsibility for his actions than anyone else who pleads guilty to a crime.  And indeed, even in the defendant's brief allocution, he appeared to be—before being interrupted by his counsel—minimizing his conduct and suggesting that his misconduct was limited to false statements about *who he was*, rather than the fact that none of his purported "investments" actually existed:

> THE COURT: Mr. Lewis, would you please stand now and tell me what you did that makes you guilty of the three crimes to which you are pleading guilty.
>
> THE DEFENDANT: I lied to victim one, claimed to have been a billionaire, and during that process elicited him to wire money into my account. I did the same thing to the second victim that caused her to wire money into my account. And I used an ID of an individual that I did not know and used that name as the name to elicit the fraud in Count One and Count Three.
>
> THE COURT: And why did you tell these lies and instruct these people to wire money to you?
>
> THE DEFENDANT: The simple answer is poor judgment on my part but I just -- I made a huge mistake, and I was a convicted felon and I was trying to hide the fact that I was, and **I robbed the two victims of the chance they may have not cared that I was a convicted felon**, but I robbed them of that chance of ever knowing for sure, because I never told them the truth.
>
> THE COURT: And what did you intend to get out of these transactions?
>
> THE DEFENDANT: **I had believed that I had another investment and** –
>
> MS. RENDELMAN: One moment, Judge.  One moment.
>
> (Defense counsel and defendant confer.)

Plea Tr. at 32 (emphases added).  While the defendant has indeed met the requirements for acceptance of responsibility credit under the guidelines by pleading guilty, he has demonstrated no remorse whatsoever—and any remorse claimed at this late stage should be viewed with the understanding that it is coming from a defendant who will say *absolutely anything*, no matter how false, to achieve his personal aims.

A lengthy sentence would be appropriate both to send the message to the defendant that his conduct was abhorrent and to prevent him from victimizing others for at least some meaningful period of time.  As Victim-2 writes, she worked to help bring the defendant to justice "so [she doesn't] have to worry that he is on the street to come after me or his next unsuspecting victims." A meaningful sentence in this case will forewarn others, and the defendant, that this kind of conduct is serious, significant, and intolerable.

In sum, the nature of the defendant's conduct shows the appropriateness of a sentence at the top of the Guidelines Range as a means both to promote respect for the law and to deter future abuses by not only other individuals, but the defendant himself.  *See* 18 U.S.C. § 3553(a)(2)(A) & (a)(2)(B).

### B.   The Defendant's Arguments for a Below-Guidelines Sentence Are Unpersuasive

The defendant asks the Court to impose a below-guidelines sentence.   This request should be denied.

The defendant argues that a below-guidelines sentence is justified in light of the defendant's acceptance of responsibility, his supposed "continued employment in the course of his life," his supposed low risk of recidivism, and his "positive influence and efforts in prison."  *See* Def. Mem. 1, 6, 8, 11.  None of these factors justifies a below-guidelines sentence.  As described above, the defendant's acceptance of responsibility has been the minim required to plead guilty— that is, acknowledging that he committed the offenses.  That acceptance of responsibility is already

taken into account by the stipulated guidelines calculation, and the defendant should get no extra credit for it—particularly because the evidence against him was, and is, overwhelming.  Similarly, for the reasons described above and below, the defendant is an extraordinarily high risk for recidivism—this is his third felony conviction, which strongly suggests that prior convictions and sentences did not deter him from criminal conduct; he was willing to tell lies for years, including to individuals close to him, and to manipulate and threaten his victims; and he created a false identity by stealing the name, birthdate, and social security number of other individuals to create the false image of wealth, reliability, and piety.

With respect to the defendant's work history, there is essentially no indication, and certainly no way to verify, that he has had *any* legal, gainful employment over the past 20 years.  As noted in the PSR, virtually all of the defendant's claimed work history since 2000 was self-employment and could not be verified.  (*See* PSR ¶¶ 138-42.)  The Government has not been able to identify any information that would indicate that any of the defendant's entities were legitimate, or that they even existed, including "Predictive Analytics" (which supposedly involved "mathematics and analyzation"), "Requires Effort" (for which there is apparently no record in Wyoming, where it was supposedly incorporated), "Debt Credit Guru" (for which there is no apparent record of the website supposedly associated with the company), and "Capitalist Ventures" (for which incorporation was permanently revoked at an unknown time).  (*See* PSR ¶¶ 138-40.)  Prior to that, in 2001 and 2001, the defendant worked at a concession stand, a business that "ended when he was arrested in July 2001 for theft of services, which was related to this business."  (PSR ¶ 141.)  Simply put, there is no indication in the record that the defendant has any history of legitimate, meaningful, gainful employment, much less that his work history indicates "a high work ethic and ability to successfully contribute to society," as the defense claims.  *See* Def. Mem. at 6.

With respect to the defendant's conduct in prison, the efforts described in the defense submission are admirable.  However, the defendant has undertaken those efforts knowing he is about to be sentenced for multiple federal crimes, and his recent conduct should be viewed in that context.  When he thought he would not be caught, the defendant committed a series of massive frauds against multiple individuals, facilitated by identity theft and a mountain of lies.

### C.   The Recommendation of the Probation Office and the View of the Victims

The U.S. Probation Office notes that the defendant engaged in a series of schemes to misrepresent his identity, wealth, and professional and personal background to defraud multiple individuals and at least one corporate entity.  The Probation Office accurately describes the defendant's actions as "calculated, deceitful, and purposeful."  It also notes that the defendant himself predicted that if he were reported by a victim to law enforcement, he would declare bankruptcy and receive a "slap on the wrist."  As part of the justification for recommending a sentence of 94 months of incarceration, the Probation Office explains:  "The defendant did not participate in one illegal act on one day that can be attributed to a single lapse in judgment.  He utilized various individuals and/or entities and attempted to conceal his illegal activities on several occasions. . . . The defendant's greed appears to have no end."  (PSR at 35.)

Victim-1 writes to the Court:  "Based on the actions and deeds of the defendant, it is my hope that you will sentence him to the maximum penalty available under the law.  It will take me considerably more time than that to repair my life and the relationships with my children, family, and friends."  Impact Statement of Victim-1 at 2.  Victim-1 also describes the defendant as "a reader of people with the ability to quickly determine who he can manipulate, how quickly, and by what means."  *Id.* at 1.  The defendant even told Victim-1 not to pay taxes, so the defendant could steal even more money from Victim-1, and after years of being exploited and defrauded by

the defendant, Victim-1 was forced to file for bankruptcy "and did not have the ability to pay rent and ended up living on the charity of lifelong, true friends." *Id.*

Additionally, the defendant's emotional manipulation of Victim-1 caused not only financial losses, but estrangement from his family, at the suggestion and urging of the defendant, including the end of Victim-1's marriage of more than 30 years. *Id.* Victim-1 further explains: "Any restitution will help me rebuild my life financially but will not address the destructive emotional distress caused by the defendant and his actions." *Id.*

Victim-2 writes to the Court: "[The defendant] told me writing a bad check would land him in prison for more than twenty years and then mocked the court system. He told me that I would only receive $1 a month restitution from this court. I would urge this court to take this con man at his own words and give him the twenty years he said one would get but didn't believe he would get. He truly deserves this and not the "slap on the wrist" that he said he would get from this court." Impact Statement of Victim-2 at 3. Victim-2 describes having "lived through hell with [the defendant], I was conned, tormented, had my life threatened and was constantly belittled," all of which led her to feelings of worthlessness and uselessness to her family. *Id*. at 2.

## Conclusion

In countless moments during the perpetration of his schemes, the defendant made choices: the choice to go to "work" every day and lie to and defraud his employees; the choice to steal and utilize the identifying information of other, real individuals, to hide his criminal past and to create a new, fictitious identity as a person of vast wealth and sophistication; the choice to manipulate and deceive his supposed friends and his associates; and, most importantly, the choice to steal from others, and to lie to them to get their money, over and over and over again, for years. For these reasons, and the reasons set forth above, the Government respectfully submits that a sentence of

102 months of imprisonment is necessary here and would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Dated: New York, New York
        October 5, 2023

                                        Respectfully submitted,

                                        DAMIAN WILLIAMS
                                        United States Attorney

                            By:    _____
                                        Alex Rossmiller
                                        Assistant United States Attorney
                                        (212) 637-2415

Cc:     *Counsel for the defendant* (via ECF)